[Civil No. 2592. Filed October 17, 1927.]

[260 Pac. 199.]

LIN B. ORME, C. O. CASE, JOHN W. MURPHY, as Members of the Board of Pardons and Paroles, Appellants, v. JACK J. ROGERS, Appellee.

Mr. John W. Murphy, Attorney General, and Mr. Frank J. Duffy and Mr. Earl Anderson, Assistant Attorneys General, for Appellants.

Mr. Edward J. Flanigan, for Appellee.

LOCKWOOD, J.—In June, 1923, Jack J. Rogers was convicted of the crime of uttering a fictitious check. He was sentenced to serve not more than five nor less than four years in the state prison, commencing with the eighteenth day of June. On September 23d, 1926, Rogers through his attorneys filed a petition in the superior court of Maricopa county for a writ of *mandamus* to compel the appellants Lin B. Orme, C. O. Case and John W. Murphy, members of the board of pardons and paroles, to permit him to appear before the board to ask for a parole.. The petition sets forth that, under certain

provisions of the statutes, he was entitled to a reduction of his sentence for good conduct, and that such credit should be applied to his minimum sentence, and that he was therefore entitled to appear and urge his right to a parole on and after June 3d, 1926. The answer to the order to show cause set up that the credit for good conduct had been deducted from the maximum term of his sentence, so that it would expire on the seventeenth day of January, 1927, while his minimum without any time deducted would expire on the seventeenth day of June of that year. Upon these pleadings and facts the court found as a conclusion of law that the appellee was entitled to have his good conduct time allowance applied to his minimum sentence, and that it was the duty of the board of pardons and paroles to allow him to appear before them to apply for a parole at any time after the eighteenth day of June, 1926. The writ of *mandamus* was issued upon this finding and appellants have brought the matter before us for review.

There is but one question of law for our consideration, and that is whether the deduction provided for by paragraph 1448, Penal Code of 1913, should be credited on the maximum period of sentence or upon its minimum. We have passed on the precise question involved in this appeal in the case of *Clark* v. *State,* 23 Ariz. 470, 204 Pac. 1032, and indirectly though not specifically, on the same question in *State* v. *Superior Court,* 30 Ariz. 332, 47 A. L. R. 401, 246 Pac. 1033. Notwithstanding this fact, we shall re-examine the case as though it were a matter of first impression.

It is apparent to us that our various penal statutes were adopted under the influence, conscious or unconscious, of a definite theory of criminology, while our administrative authorities have frequently attempted to interpret these statutes on the basis of a different theory, and from this conflict much of our present confusion has arisen. A proper interpretation of the

statutes requires that we understand these theories, and a brief discussion of the history and spirit of penal legislation in general is therefore advisable.

Crime may be defined logically as any violation of the legally established order, while punishment is the penalty for such transgression of the law. When legislation first arose in regard to crime, it was generally considered that the infliction of punishment was the right of the individual adversely affected by the crime, and not particularly that of the state, and the spirit of private vengeance on behalf of the injured party was at the basis of our laws. The old Mosaic doctrine of "an eye for an eye, and a tooth for a tooth," the right given the victim under the Roman law in certain cases of theft to slay the thief, the Germanic doctrine of the blood feud—all were illustrations of a period of society when this theory of punishment was almost universal. Gradually, however, as the state grew stronger there arose the idea that the real *crime* was not the invasion of the rights of the individual, but the breach of the rules laid down by the state for the preservation of peace, and, while the injured party still retained the right of reparation as a civil action, punishment as such was administered at the instance of and to vindicate the rights and dignity of the collectivity, the state itself.

But when this standard is once accepted, the character of punitive legislation depends essentially on the view taken as to the moral responsibility of the offender. The great conflict in our laws attempting to suppress crime in the past two hundred years has been caused by the prevalence, from time to time, of first one idea and then another on this point. The older school of thought, commonly called the classical, was based on the philosophical concept of the freedom of the will. As was well said by one of the greatest of modern writers on criminology:

"It was presumed that those guilty of the same crime, theft, murder, etc., must have been equally free agents and consequently equally responsible. Every crime was assumed to involve a like moral freedom and to imply a like responsibility. . . . The status of every man in resolving upon the same act is parallel. He has the choice of two courses, to act or to refrain. The responsibility varies, not with the measure of freedom, but with the gravity of the act in question. It is not the place of the law to consider anything but the social and material seriousness of the crime. All guilty of the same crime present the same responsibility. Hence there is no pertinence in taking into account the age, no advantage in considering the personality. Ignoring such considerations, the deed alone is to be dealt with. . . . " Saleilles, Individualization of Punishment, pp. 55, 56.

This school of thought is reflected in nearly all the criminal statutes prior to the first half of the nineteenth century. Each particular offense had a definite penalty annexed thereto, and the judge had no right to consider anything but whether or not the individual had committed the act in question. Age, previous record, provocation had nothing to do with the case. The individual had of his own free will broken the rule—the penalty was fixed, and he must pay it. This system had two merits, all were treated alike, and the defendant was not subject to the arbitrary whim of the trial judge in the imposition of sentence. But the equality was only in name, for the equality that justice demands is an equality of treatment for the same degree of criminology, and how can a comparison be established between the recidivist, hardened to prison life, and the first offender, upon contact with his humiliating fate; between one accustomed to the amenities of life, to whom the prison routine must be intolerable, and the poor fellow without shelter, who has come to look upon

jail, and even the penitentiaries, as dispensers of hospitality, offering an assured living and a shelter for the unemployed? However this may be, such was the system, and it may be summarized in these words: The punishment for the same crime should be the same because the moral responsibility is the same.

This theory to the ordinary man, on first thought, is plausible, simple and easy to apply. Here is an injustice to be repaired, and there is a punishment that will make it good. But as humanity has evolved, and along with its other evolution the sense of justice has become more developed, it was realized that the old classical system was unjust, and as a consequence a new theory, the so-called neo-classic, came into vogue. It, too, was based fundamentally upon the doctrine of responsibility for one's acts, but recognized that while man, considered abstractly, enjoys perfect freedom to commit an act or refrain therefrom, yet such freedom may be affected by heredity, education and countless other circumstances and that the degree of responsibility depends upon the actual, not the theoretical, freedom exercised by the individual. Starting with this premise, that is, that freedom and individual responsibility are relative and individual, the theory of punishment was partially changed, and it was held that the penalty for the crime should be graded in proportion to the amount of the freedom and therefore the responsibility. This theory was still, however, based on responsibility and freedom of the will, and the punishment therefore was intended to act directly upon the offender by making the unpleasant consequences of his breach of law so great that his will would be properly exercised if the temptation again presented itself, and indirectly by example on all others who might find themselves under similar temptation.

But many students of criminology were not better satisfied with the reasoning and conclusions of the

neo-classical school than of the original from which it sprang, and a third school has arisen. Philosophically speaking, it rests upon what is commonly called the determinist theory of life, which denies the freedom of the will. Practically speaking, its position, at least if carried to its logical conclusion, is that we do what we do not because we will, but because we must; that our acts in any given set of circumstances are definitely determined by a thousand pre-existing factors—heredity, environment, stress of temptation and other things, and that the man who steals can no more help stealing than the cat can refrain from pouncing on the mouse which appears before it. With this premise, punishment as heretofore administered on the basis of responsibility is of itself a crime, and there are but two theories upon which any penal law is just. One is that the offender is an atavist to such an extent that he represents a stage of society no longer existing, and is nearer akin to the animal than to the human, and that he may be and should be eliminated for the same reasons and in the same manner as the man-eating tiger or the poisonous reptile. The other is that he is a member of society, with all its rights, who through some unfortunate concatenation of circumstances has become abnormal, and that society's only right and duty is, for his own sake as well as for its, to treat him as one who is diseased and to exercise only such restraint and methods as may be required to restore him to normalcy, and as soon as he is so restored, no matter what his acts in the past have been, to return him to his proper place in society, but until such recovery has been completed, no matter how petty the actual offense which he may have committed, he must for his own good remain under restraint and treatment. Each of these schools of penal philosophy has arguments in its favor; each has objections thereto. But an attempt to interpret and administer a Penal Code

which was adopted on one theory on the basis of the other is bound to result in incongruity and confusion.  With these premises in view, let us examine the Arizona statutes on the subject under consideration.  It is not our function to pass on the merits of these various schools or the laws passed under them, but by keeping these theories in mind we have the only possible light as to the intent of the legislature at the times it passed the various statutes involved.

The Howell Code of 1864, adopted shortly after the organization of the Territory of Arizona, was evidently passed under the influence of the neo-classicist school of thought, for it provided in practically all criminal cases a maximum and minimum period between which the trial judge should fix the sentence of the offender.  No provision, however, was made for any reduction of the sentence by good conduct.  The trial judge established a fixed term which the state considered as due it for the offense, and the offender upon the payment of that price, neither more nor less, had canceled his debt to the state.  Some time thereafter it was recognized that in the interests of discipline it would be well to extend some encouragement to prisoners to conduct themselves properly while undergoing their sentences, and in 1877 (Laws 1877, p. 49) it was provided that the superintendent of the territorial prison should keep a record of all infractions of the rules of discipline, and that:

"Every convict who shall have been sentenced for a term of years whose name does not appear upon such record of reports shall be entitled to a deduction of one day per month from his sentence, for each month *he shall continue to obey all the rules of the penitentiary for the period of one year* from the passage of this act."  Sec. 5.

The act further increased the deduction in case the sentence was for a greater period than one year,

providing for a forfeiture of the so-called "good conduct time," and stated:

"It shall be the duty of the territorial prison commissioners to direct the discharge of such convict when he shall have served out his sentence, less the time which shall be deducted therefrom by virtue of the provisions of this act."

It will be observed by the language of the act that there was no thought in the mind of the legislature that the prisoner was merely a sick man needing treatment, or that his term of imprisonment was for the purpose of observation and cure. He was still paying the penalty for an act committed of his own volition, but for the purposes of discipline, and that only, the penalty would be lessened for obedience to the rules of the penitentiary. He might hold and openly proclaim any views of society and his own future conduct which he pleased, even though they were to the highest degree anti-social; the authorities might be fully satisfied that he had in no manner reformed his ideals, and that when released he would return to a life of crime, but so long as he obeyed the rules laid down for the governance of the penitentiary he had earned his diminution of sentence as a matter of absolute right and must be discharged from custody in accordance therewith. The period allowed for good conduct and certain details in the method of recording it were changed from time to time until the adoption of paragraph 2440, Civil Code of 1887, which was carried over as paragraph 3589, Civil Code of 1901, and paragraph 1448, Penal Code of 1913, substantially unchanged, but it was always based on obedience to the rules of discipline and not on a general moral reform, and was a matter of right and not of discretion.

In 1901 what is now known as the "parole system" was introduced into our law for the first time (Civ. Code 1901, par. 3590 et seq.). The governor was

authorized, subject to certain restrictions, to allow an offender who had served a full year of his sentence to remain outside the walls of the prison, subject, however, to be returned thereto at any time on violating the terms of his parole, and if he was so returned, no portion of the time he was on parole was credited on his sentence. It was evidently implied, though not expressly stated, that the time spent on parole was part of the original sentence. Nothing was said therein in regard to any "good conduct time." This form of parole was based clearly on the doctrine of responsibility, for bad conduct on parole forfeited all credit for time served outside the prison, a result wholly inconsistent with deterministic theories. It contemplated "reform" from within, based on the free will of the offender, necessarily a neo-classicist doctrine, and not "cure" from without, which is deterministic in its basis.

In 1907 another step in the same direction was taken. The legislature passed what is commonly known as an "indeterminate sentence law" (Laws 1907, chap. 37). Therein it was provided that the court might, in its discretion, provide for a general sentence of imprisonment to the penitentiary. In such case the governor had the right to terminate the sentence in the same manner as in the case of paroled prisoners, when the minimum term fixed by statute had been served, and it was further provided that if such prisoner were on parole he should be deemed *serving out his sentence while outside of the penitentiary*, with his credit for good conduct *the same as if he were confined in the penitentiary*.

We think the language of this act is unmistakable that the good conduct time did not apply to the minimum term, but to the maximum fixed by law. The whole history of the good conduct provision to this time (and the language of the statute has remained substantially the same since 1887) shows that it was

an absolute right granted the prisoner under fixed conditions to be used in payment of the debt owed the state, while the parole introduced by the act of 1901 and continued in 1907 was a matter of discretion and grace on the part of the prison authorities when they were satisfied with the real "reform" of the offender, and not merely that he had obeyed the prison rules, and it was expressly stated in the indeterminate sentence law of 1907 that any such parole was not to be construed as a *satisfaction of the sentence*, but merely a permit to serve it outside the walls of the prison.

In 1909 (Laws 1909, chap. 101) the Indeterminate Sentence Law was amended, but the provisions that a parole was not to be construed as a release from sentence, and that the good conduct time should apply in the same manner as though the prisoner were in the penitentiary, were expressly re-enacted. In 1912 the law was again amended (Laws 1912, chap. 46), providing that the indeterminate sentence must be imposed by the court with the minimum and maximum fixed by statute as the penalty for the crime. Therein it was expressly stated that only prisoners whose minimum term of sentence had expired could apply for a parole, and that when a prisoner was paroled he was still in the custody of the parole clerk and the warden of the penitentiary until the expiration of the maximum term specified for his sentence, or until he was absolutely discharged in the manner provided by law. Nothing whatever was said in such statute in regard to the good conduct time.

In 1913 (see Pen. Code 1913, § 1127) the legislature again changed the provision in regard to the indeterminate sentence by allowing the trial judge to designate the maximum and the minimum period, instead of leaving such periods as fixed by statute. The law in regard to paroles was modified, but still contained provision that only the prisoner who had served his minimum term of sentence could apply for

a parole, and that the board was prohibited from entertaining any other form of application or petition for the parole or discharge of a prisoner except as provided in the statute, and a clause was added to the effect that, *after parole,* the proper authorities might grant an absolute discharge from the sentence. This discharge is more than a parole in that it releases the prisoner from any further imprisonment *for the same offense,* no matter what his conduct thereafter, but less than a pardon in that it does not restore his right to vote, sit on a jury, etc. The law since that time has remained substantially the same.

In view of the course of legislation in the state of Arizona above recited, as examined in the light of the general history of criminology and the theories applying thereto, we are fully convinced that when the rule for good conduct time was first laid down it was given to the prisoner as a matter of *absolute right,* to be applied only in cancellation of the *definite debt he was held to owe the state,* and that such rule has never been changed. We are of the opinion that counsel for petitioner has been misled by the erroneous view that the so-called "minimum sentence" is, as a matter of law, a period fixed at which some portion of the debt which the law assumes the prisoner owes to the state is canceled. As we have pointed out, this is not true. Under the Indeterminate Sentence Law, the only time at which the prisoner could ever claim his debt to the state is satisfied as of right is the expiration of the maximum period fixed by his sentence, less such good conduct time as may be given by the statute. The so-called "minimum sentence" is, and has been since its inception, merely a period at which, and not before, as a matter of grace and not of right, the prisoner may be allowed to serve the balance of his sentence outside the walls of the penitentiary under such circumstances and con-

ditions as the authorities may provide, or be discharged, but that the only *right* which such minimum period gives him is the right to *request* from the proper authorities such mitigation of his sentence.

Such being the case, it seems to us that it would be absurd to hold that a credit given as a matter of right for the purpose of lessening the debt owed the state was meant to apply to a period fixed, not as the time when the offender might say, "My debt is paid, full release is mine as of right," but as the date when he might petition for permission to serve his sentence under easier conditions or be discharged, if the authorities, as a matter of grace consented thereto. We hold, therefore, that the good conduct time granted by the statute applies not to the minimum period fixed by the sentence, which, as we have stated, is not the time at which under any circumstances the prisoner is entitled to a full release as a matter of right, but to the maximum period, which is the only one at which the prisoner may claim as such right to be fully discharged from the consequences of his offense.

It may be that eventually it will be decided that the determinist school of penology is right in its theory of punishment, and that our laws will be so amended and changed as to fully carry out such theory. In such case, of course, there would be no necessity for any minimum, maximum, or good conduct time. The authorities established by law would have full discretion to release a prisoner at any time which they in their judgment thought proper, even if it were the first day of his incarceration, or to retain him confined for the period of his natural life, no matter what his offense, if they believed he had not been fully restored to normalcy. This, however, is a question for the legislature and the people of the state to determine, and not for us. We can but

declare the law as it exists now, not as we as individuals might think it should be.

The judgment of the superior court of Maricopa county is reversed and the cause remanded, with instructions to deny the writ of *mandamus*.

ROSS, C. J., and McALISTER, J., concur.